**George F. NOONAN and Ann Marie Noonan, Plaintiffs, Appellants,**

v.

**The WINSTON COMPANY, et al., Defendants, Appellees.**

No. 97–1132.

United States Court of Appeals, First Circuit.

Heard Sept. 5, 1997.

Decided Feb. 2, 1998.

Rehearing Denied March 9, 1998.

Michael D. Lurie, with whom Alex H. MacDonald, H. Bissell Carey, III, and Robinson & Cole, Boston, MA, were on brief, for appellants.

Ralph G. Elliot, with whom Tyler Cooper & Alcorn, Hartford, CT, Walter H. Mayo, III, and Casner & Edwards, Boston, MA, were on brief, for Colour Library Books, Ltd.

Robert M. Callagy, Joshua M. Rubins, Satterlee Stephens Burke & Burke LLP, New York City, David R. Friedman, and Palmer & Dodge, Boston, MA, were on brief, for The Winston Company, et al.

Before BOUDIN, Circuit Judge, STAHL, Circuit Judge, and YOUNG,* District Judge.

* Of the District of Massachusetts, sitting by designation.

STAHL, Circuit Judge.

Plaintiffs-appellants George and Anne Marie Noonan challenge the district court's dismissal, on personal jurisdiction grounds, of their defamation, misappropriation and violation of the right of publicity, and related claims against Colour Library Books, Ltd., Lintas:Paris, R.J. Reynolds Tobacco Company, R.J. Reynolds Tobacco International, Inc., R.J. Reynolds France, S.A., Worldwide Brands, Inc., and Lintas:Worldwide. Having fully considered plaintiffs' arguments, we affirm.

## I.

### A. General Background

George Noonan, a Boston Police Detective and a devoted non-smoker, has spent the bulk of his twenty-two year career educating Bostonians about the health risks of tobacco use. During the summer of 1992, a magazine advertisement sponsored by Winston cigarettes featuring Noonan's image appeared in several French magazines. Noonan claims that the unauthorized use of his image to benefit tobacco sellers has caused him personal and professional harm and embarrassment.

The offending photograph has a long history. In 1979, Neil Sutherland, an employee of the English book packaging house[1] Colour Library Books ("CLB"), photographed Noonan in Boston without his permission. Although the photograph was meant to appear in a coffee table book titled *Boston: City of Dreams*, it was never published or distributed. The photograph remained in CLB files until 1990, when CLB published it in *An American Moment*. Two years later, CLB sold the photograph to the French advertising agency Lintas:Paris, with no restrictions on its use and without advising Lintas:Paris that Noonan had not granted a release. Lintas:Paris used the photograph in a campaign for client R.J. Reynolds France, S.A. ("RJR France"), a French cigarette manufacturer.

RJR France had retained Lintas:Paris to design an advertising campaign both to publicize Winston cigarettes and to market an

1. Packaging houses design and print books to be sold to publishers.

informational communications system called The Minitel Service, an interactive network that provides consumer services such as personal shopping, banking, and remittance of income taxes. Companies sponsor segments of the service in exchange for a share of the revenues generated. The Winston Way, one component of the Minitel Service, provides information about dining and entertainment in France and is sponsored by the Cooperation Gesellschaft fuer Markendiversifikation mbh, a German company affiliated with RJR France and unrelated to this action.

The full-page advertisement pictures Noonan in his Boston Police uniform and on horseback at Faneuil Hall in Boston. The text reads, "The Winston Way," printed in the form of the Winston cigarette logo— white letters against a red background. The advertisement also provides a phone number for Minitel. Without the knowledge of Lintas:Paris, at least 305 copies of various French magazines containing the advertisements were distributed to, and at least 183 of these were sold from, retail magazine outlets in the Boston area.

Noonan became aware of the offending advertisement during the summer of 1992. Fellow police officers told Noonan that a magazine with a picture of him on the back cover was circulating. Nancy Fay, a Massachusetts resident who had seen the advertisement while vacationing in France, brought the advertisement to Boston and wrote to Noonan to inquire whether the cigarette manufacturer had paid Noonan for the advertisement. Noonan's son Greg saw the advertisement when his French teacher brought a copy of a magazine containing the advertisement to class; Greg's faculty advisor told Greg that he had seen the advertisement in France. Some people, assuming that Noonan had consented to the use of his image, denounced him for supporting the cigarette industry. As a result of what Noonan felt was an attack on his reputation, he initiated this suit.

Given the number of parties to this litigation and the importance of their relationships to plaintiffs' jurisdictional theories, we begin with a brief overview of the defendants. Defendant Lintas:Paris is a French corporation, with its only office in Paris, France. Defendant RJR France, also a French corporation, has corporate offices in Boulogne–Billancourt, France. Defendant R.J. Reynolds Tobacco ("RJR Tobacco") is a New Jersey corporation with its principal place of business in New York, New York. RJR Tobacco is the organization through which its parent company, RJR Nabisco, Inc., conducts its domestic cigarette business. Defendant R.J. Reynolds Tobacco, International ("RJRTI"), the international analogue to RJR Tobacco and also a wholly-owned subsidiary of RJR Nabisco, Inc., is a Delaware corporation with its principal place of business in Winston–Salem, North Carolina. Defendant Worldwide Brands, Inc. ("Worldwide"), a dealer in trademark rights and licenses and another RJR Nabisco, Inc. subsidiary, is also a Delaware corporation. Worldwide's French offices are in Boulogne–Billancourt. Defendant Lintas:Paris is a wholly-owned subsidiary of France C.C.P.M, in turn a wholly-owned subsidiary of Lintas Holdings, B.V., itself a wholly-owned subsidiary of the Interpublic Group of Companies, Inc. ("Interpublic"). Noonan asserts that defendant Lintas:Worldwide is an advertising corporation managed by Interpublic. Defendants claim, and the district court found, that Lintas:Worldwide is not a legal entity. For reasons we shall explain *infra*, its existence *vel non* does not affect our decision. Finally, defendant CLB is a British company with offices in Surrey, England.

## B. Prior Proceedings

The complaint sets forth five direct claims—misappropriation and violation of the right of publicity, *see* Mass. Gen. Laws Ann. ch. 214, § 3A (West 1985 & Supp.1996); defamation, invasion of the right of privacy, *see id.* § 1B; reckless or intentional infliction of emotional distress; unfair and deceptive acts, *see id.* ch. 93A, §§ 2, 11—and a derivative claim for loss of consortium, brought by Mrs. Anne Marie Noonan.

The district court initially dismissed all claims, pursuant to Fed.R.Civ.P. 12(b)(2), except those against CLB for lack of personal jurisdiction over named defendants. *See Noonan v. The Winston Co.,* 902 F.Supp. 298

(D.Mass.1995) ("*Noonan I*"). After allowing Noonan limited jurisdictional discovery with respect to CLB, the court dismissed all claims against CLB. *See Noonan v. Colour Library Books, Ltd.,* 947 F.Supp. 564 (D.Mass.1996) ("*Noonan II*"). Noonan appeals from these rulings.

■ Because the district court dismissed plaintiffs' claims without holding an evidentiary hearing, we review the rulings *de novo,* drawing facts from the parties' pleadings and supplementary filings, and construing all inferences in the plaintiffs' favor. *See Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 203 (1st Cir.1994).

## II.

On appeal, plaintiffs advance four arguments. First, they assert the district court erred in concluding that it lacked specific jurisdiction over defendants CLB, Lintas:Paris (as RJR France's agent), and RJR France (as Lintas:Paris' principal). Second, they contend the district court erred by failing to exercise general jurisdiction over RJR Tobacco and CLB. Third, they claim the district court abused its discretion when it denied them permission to take jurisdictional discovery before it ruled on the motions to dismiss for lack of personal jurisdiction filed by defendants RJTC, RJRTI, RJR France, Lintas:Worldwide, Lintas:Paris, and Worldwide Brands. Finally, they argue the district court improperly limited jurisdictional discovery as to CLB.

■ "Specific personal jurisdiction may be asserted where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." *United Elec., Radio & Mach. Workers of America v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088–89 (1st Cir. 1992) ("*Pleasant I*") (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 & n. 8, 104 S.Ct. 1868, 1872 & n. 8, 80 L.Ed.2d 404 (1984)). "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based con-

tacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *Id.* at 1088 (citing *Helicopteros,* 466 U.S. at 414–16 & n. 9, 104 S.Ct. at 1872–73 & n. 9). Three questions constitute both the specific and general personal jurisdiction analyses: 1) whether the Massachusetts long-arm statute authorizes jurisdiction; 2) whether the defendant has sufficient minimum contacts so that the exercise of jurisdiction does not offend due process; and 3) whether the exercise of jurisdiction is reasonable, and therefore does not offend due process. *Cf. United Elec., Radio & Mach. Workers of America v. 163 Pleasant St. Corp.,* 987 F.2d 39 (1st Cir.1993) (setting out steps for jurisdictional analysis generally) ("*Pleasant II*"). We determine reasonableness by applying factors we have described as "gestalt factors."[2] If the requirements of either the state statute or the Due Process Clause of the U.S. Constitution are not met, the foreign defendant will not be subject to personal jurisdiction.

### A. Jurisdictional Issues

#### (i) Specific Jurisdiction over CLB

■ As an initial matter, we decline to consider whether CLB is subject to personal jurisdiction under a theory of specific jurisdiction because the Noonans did not assert this theory below. Plaintiffs initially opposed the defendants' motions to dismiss by arguing that the district court had specific jurisdiction over all the defendants. After completing discovery over CLB, however, plaintiffs abandoned their specific jurisdiction claim against CLB, arguing only that the court had general jurisdiction over it or, in the alternative, that jurisdiction should be found as a sanction for CLB's failure to comply in good faith with its discovery obligations. Plaintiffs, therefore, may not raise a specific jurisdiction theory against CLB now, for "[i]f any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised

---

**2.** The criteria are: "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most

effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *Pleasant I,* 960 F.2d at 1088.

squarely in the lower court cannot be broached for the first time on appeal." *Teamsters, Local No. 59 v. Superline Transp. Co.,* 953 F.2d 17, 21 (1st Cir.1992). There are no extraordinary circumstances in this case; plaintiffs had ample time to consider and advance their best arguments supporting specific jurisdiction.

### (ii) *Specific Jurisdiction over Lintas:Paris and RJR France*

 Because we determine that the assertion of personal jurisdiction over Lintas:Paris and RJR France would offend due process, we decline to decide the difficult question whether plaintiffs have established a *prima facie* case authorizing personal jurisdiction over these defendants under the Massachusetts long-arm statute. *See Ticketmaster,* 26 F.3d at 205; *U.S.S. Yachts, Inc. v. Ocean Yachts, Inc.,* 894 F.2d 9, 11 (1st Cir.1990); *Eveland v. Director of Cent. Intelligence Agency,* 843 F.2d 46, 50 (1st Cir.1988).

 The Due Process Clause of the Fourteenth Amendment permits a state to exercise personal jurisdiction over a non-resident defendant only when the defendant has sufficient minimum contacts with the forum. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Sufficient minimum contacts exist for specific jurisdiction when "(1) the claim underlying the litigation ... directly arise[s] out of, or relate[s] to, the defendant's forum-state activities, (2) the defendant's in-state contacts ... represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable, and" (3) exercising jurisdiction is fair under the gestalt factors. *Pleasant II,* 987 F.2d at 43 n. 9. The decisive due process issue in this case is whether the defendants' activities satisfy the purposeful availment requirement.

Plaintiffs correctly draw our attention to *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), in which the Supreme Court adopted an effects test for determining purposeful availment in the context of defamation cases. *Calder* concerned two Florida reporters, employed by *The National Enquirer,* who wrote a libelous article about California entertainer Shirley Jones. *Id.* The Supreme Court held that jurisdiction properly could be asserted over the reporters because the defendants had aimed an act at the forum state, knew the act would likely have a devastating effect, and knew the injury would be felt in the forum state, where Jones lived and worked "and in which the National Enquirer ha[d] its largest circulation." *Id.* at 790, 104 S.Ct. at 1487.

Plaintiffs' circumstances satisfy only the injurious-effects part of the *Calder* test. Like Jones, plaintiffs felt a tortious effect in the forum state where they lived and worked. Moreover, the content of the picture—a Boston Police Officer in uniform, sitting on a saddle blanket decorated with the Boston Police insignia, in front of a distinctive Boston landmark—indicated where any injury would be felt.

For the first part of *Calder*'s framework to be satisfied, however, the defendants must have acted toward the forum state with sufficient intent to make them "reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567–68, 62 L.Ed.2d 490 (1980). In *Calder,* the court found that the defendants' intentional conduct was "*calculated* to cause injury to respondent in California." *Calder,* 465 U.S. at 791, 104 S.Ct. at 1488 (emphasis added). There is no analogous intentional behavior here.

 Plaintiffs do not allege, and the record does not suggest, that any acts by Lintas:Paris[3] were committed with sufficient purpose to satisfy the intent requirement.[4]

---

3. We first consider Lintas:Paris' actions alone because the Noonans' jurisdictional claims over RJR France rest on its agency relationship with Lintas:Paris. The viability of plaintiffs' claims against RJR France depends on our first finding that Lintas:Paris purposefully availed itself of the forum state.

4. The district court emphasizes that Noonan "did not allege any of the defendants ... even knew who he was, much less that they published his picture intending that he be harmed in Massachusetts." *Noonan I,* 902 F.Supp. at 305. In our view this argument implies too high a juris-

The defendants did not direct their actions toward Massachusetts. That the advertisement contains French text and a French phone number suggests Lintas:Paris created it for a French audience. This interpretation is corroborated, without contradiction, by a Lintas:Paris representative who stated that "[t]he advertisement was aimed solely at the French consumer market." Roux Aff., ¶ 12. Furthermore, Lintas:Paris "was not aware that some copies of the magazines bearing the advertisement" would reach Massachusetts. *Id.* ¶ 15.

Although plaintiffs fleetingly refer to Lintas:Paris' knowledge that the advertisements would reach Massachusetts and passingly contest the district court's denial of discovery as to what Lintas:Paris should have known, they do not dispute Lintas:Paris' claims of actual ignorance.[5] Instead, relying on *Calder* and other cases where the defendant intentionally sent fraudulent or defamatory material into the forum, plaintiffs imply that the defendants' intent to reach Massachusetts can be inferred from the placement of advertisements in publications with international circulations. *Cf. Murphy v. Erwin–Wasey, Inc.*, 460 F.2d 661 (1st Cir.1972) (defendant intentionally sent fraudulent material into forum); *Borschow Hosp. & Med. Supplies, Inc. v. Burdick–Siemens Corp.*, 143 F.R.D. 472 (D.P.R.1992) (defendant sent letters into forum).

In *Calder*, because the libelous story was generated from California sources, concerned a California celebrity, and appeared in a newspaper with a forum circulation of 600,-000 copies, the Court found that California was the focal point of both the effect and the story. *See Calder*, 465 U.S. at 789, 104 S.Ct. at 1486–87. Here, however, plaintiffs' claims rest on an advertisement which appeared in 305 individual magazines, circulated in Massachusetts. This small distribution, by itself, does not merit a finding that Massachusetts was the focal point of the events in question, or that Lintas:Paris aimed the advertisements toward Massachusetts. The size of a distribution of offending material helps determine whether a defendant acted intentionally. The Supreme Court has held that a publisher's regular circulation of a large number of magazines containing allegedly libelous content in a forum state indicated deliberate and continuous exploitation of a market and, therefore, was sufficient to support jurisdiction. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781, 104 S.Ct. 1473, 1481–82, 79 L.Ed.2d 790 (1984). Just as widespread circulation of a publication indicates deliberate action, thin distribution may indicate a lack of purposeful contact. *See Chaiken v. VV Publ. Corp.*, 119 F.3d 1018 (2d Cir.1997) (holding that jurisdiction over an Israeli publisher for a libel action involving an insignificant distribution—four copies or .04% of total circulation—offends due process), *cert. denied*, —— U.S. ——, 118 S.Ct. 1169, —— L.Ed.2d —— (1998).

Plaintiffs urge us to rely on *Gordy v. The Daily News*, 95 F.3d 829 (9th Cir.1996), a case in which the Ninth Circuit found that the distribution of under twenty newspapers was sufficient to confer jurisdiction over a foreign newspaper and its reporter. Unlike Lintas:Paris, however, the *Gordy* defendants targeted the forum state by distributing newspapers via regular customer subscriptions to forum addresses. Here, as noted, Lintas:Paris denies knowing the ultimate destination of the magazines that reached Massachusetts, and plaintiffs have not alleged otherwise. While we sympathize with George Noonan's distress at seeing his image

dictional hurdle. Because this is an inquiry regarding jurisdiction, not the underlying tort, the defendant must only be shown to have intentionally directed an act, tortious or otherwise, toward the forum state. The defendants' lack of a specific intent to harm Noonan is irrelevant.

**5.** As noted above, plaintiffs only vaguely referred to Lintas:Paris' knowledge in its appellate brief. Further, plaintiffs perfunctorily asserted to the district court, in a footnote, a need for discovery as to whether Lintas:Paris should have known

that the magazines would be distributed in Massachusetts. These assertions are not tantamount to a rebuttal of Lintas:Paris' claims of ignorance. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Nor is the footnote sufficient to have preserved an argument that negligence is sufficient to constitute purposeful availment.

used to promote a product he despises, his Massachusetts-based injury is not enough to support jurisdiction over the defendants. To find otherwise would inappropriately credit random, isolated, or fortuitous contacts and negate the reason for the purposeful availment requirement. Without finding minimum contacts, we need not, and do not, proceed to the reasonableness analysis. *See Donatelli v. National Hockey League*, 893 F.2d 459, 471 (1st Cir.1990).

### (iii) *General Jurisdiction over CLB and RJR Tobacco*

According to plaintiffs, CLB's and RJR Tobacco's contacts with Massachusetts were sufficiently continuous and systematic to permit the district court to exercise general jurisdiction.

### (a) *CLB*

■ We begin our analysis with the relevant section of the Massachusetts long-arm statute:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . .
>
> (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth. . . .

Mass. Gen. Laws Ann. ch. 223A, § 3(d) (1985 & Supp.1996). In our effort to "effectuate . . . [the Commonwealth's] legitimate desire to protect its citizens," we construe the statute broadly. *Mark v. Obear & Sons, Inc.*, 313 F.Supp. 373, 376 (D.Mass.1970).

■ Viewing the facts in a light most favorable to plaintiffs, the threshold requirement of § 3(d), that plaintiffs' in-state harm was caused by the defendant's out-of-state act, is easily met. The plaintiffs suffered an injury in Massachusetts where the use of George Noonan's image caused him shame and embarrassment and engendered the loss of consortium of which Anne Marie Noonan complains. Furthermore, CLB's allegedly improper act, the unauthorized sale of the photograph containing Noonan's image, was a foreign act that arguably contributed to plaintiffs' in-state injuries.

Plaintiffs' appeal raises the issue of whether the district court properly decided that plaintiffs failed to satisfy the second requirement of § 3(d), that CLB had sufficient additional contacts with the forum. The district court assumed that plaintiffs' "best case [fell] under the 'substantial revenues' test of § 3(d)," and found the revenues insufficient to meet the test. *Noonan II*, 947 F.Supp. at 571. We think, however, plaintiffs' best case falls under the "doing or soliciting business" test. Because this clause is disjunctive, only one of its prongs needs to be satisfied. While the parties energetically debate the success of CLB's Massachusetts solicitations, we measure only the solicitations themselves.

CLB solicited business in Massachusetts with sufficient regularity to satisfy the statute. Beginning in the fall of 1992 and continuing until plaintiffs' complaint was filed in May 1994, CLB employees regularly solicited business from World Publications, Inc. ("World"), a remainder house located in Dighton, Massachusetts. During the two-year period, CLB employees telephoned, faxed, and wrote to World to secure book orders.[6] In addition, CLB employees traveled from England to Massachusetts on at least two occasions with the intention of developing a relationship with World. Finally, in the spring of 1994, World employees visited CLB in England to negotiate orders.[7] In

---

**6.** The lower court sets forth the details regarding CLB's courtship of World, beginning with the early 1994 contacts. *See Noonan II*, 947 F.Supp. at 567–68. Because the district court recognized only successful solicitations, it did not recount the following pre–1994 contacts: In October 1992, CLB's International Sales Director, Bill Dancer, began soliciting World's business. World provided CLB with a credit reference, and

CLB provided World with a credit application form. In November 1992, Dancer traveled to Massachusetts, met with World, and secured a $210,000 order.

**7.** In 1993, CLB also sought business relationships with two other Massachusetts publishers, Lauriat's Booksellers and Little Brown and Company. CLB disputes the propriety of counting

sum, CLB's direct solicitations of forum companies are adequately regular and targeted to satisfy § 3(d). *Cf. Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 217–19 (1st Cir.1989) (the sale of 6000 pairs of shoes to a Massachusetts wholesaler and the subsequent shipping of 18 sample shoes indicated defendants' intent to begin ongoing relations).

■ We therefore turn to whether these contacts are sufficient to satisfy the Constitution. Until the date plaintiffs filed their complaint, CLB's relevant contacts with Massachusetts were Neil Sutherland's visits to Massachusetts in 1979, the business solicitations discussed above, and approximately $585,000 of orders from World.[8] The standard for evaluating whether these contacts satisfy the constitutional general jurisdiction test "is considerably more stringent" than that applied to specific jurisdiction questions. *Glater v. Eli Lilly & Co.*, 744 F.2d 213, 216 (1st Cir.1984). In addition, courts must exercise even greater care before exercising personal jurisdiction over foreign nationals. *See Asahi Metal Indust. Co. v. Superior Court*, 480 U.S. 102, 115, 107 S.Ct. 1026, 1033–34, 94 L.Ed.2d 92 (1987) (citing *United States v. First Nat'l City Bank*, 379 U.S. 378, 404, 85 S.Ct. 528, 542, 13 L.Ed.2d 365 (1965) (Harlan, J., dissenting)).

Plaintiffs assert CLB's contacts were sufficient to establish general jurisdiction because they are purposeful, frequent, intense, and successful. Although our decision must be based on a fact-specific evaluation of CLB's contacts, we are guided by the types of contacts deemed sufficiently continuous and systematic in other cases.

We look to two of our previous cases in which the appellants argued, as plaintiffs do now, that general jurisdiction applied to an out-of-state seller. In both cases, the defendant had more continuous and systematic contact with the forum state than CLB had with Massachusetts. In both cases, we judged the contacts insufficient to permit an assertion of general jurisdiction.

First, in *Glater*, we found that a manufacturer who advertised, employed eight sales representatives to distribute information, and sold products to distributors in the forum was not subject to general jurisdiction. *See* 744 F.2d at 217. Although CLB's selling efforts by its England-based sales-force represented substantial work, they were not as intense, active, and frequent as those of the *Glater* manufacturer's full-time sales representatives. *Compare id.* at 214–15, 217 with *Noonan II*, 947 F.Supp. at 567–68; *see also supra* notes 6 & 7.

In *Donatelli*, we found that ten years of providing league officials at exhibition hockey games, scouting, providing television broadcasts, and selling products bearing the National Hockey League (NHL) logo, taken together, did not meet the due process test. *See Donatelli v. Nat'l Hockey League*, 708 F.Supp. 31, 35 (D.R.I.1989) (reciting facts), *reversed* 893 F.2d 459 (1st Cir.1990). Although CLB's contacts were arguably more intense than the NHL's contacts in Rhode Island, its two-year history in Massachusetts is far less continuous than the ten years of activity in that case.[9]

the Little Brown and Company contact because, in response to CLB's overture, Little Brown and Company directed CLB to contact a New York office. We need not resolve this dispute because, for purposes of § 3(d), CLB's solicitations are sufficient even without the Little Brown and Company solicitation.

8. The parties clash over which contacts should be considered in the general jurisdiction analysis. First, they dispute whether a foreign corporation's contacts with the forum should be measured up to the time of the alleged tort, up to the time the complaint is filed, or at any time. We have considered all contacts established up to the time Noonan filed his complaint. *See infra.* at 94–95. Second, they disagree over whether it is appropriate to consider revenues other than

those actually paid to CLB prior to the filing of the complaint. On this point we part company with the district court and think it reasonable to include amounts owed, but not yet paid, to CLB from orders placed by Massachusetts companies. Third, they arrive at different totals of the amounts owed, but not yet paid, to CLB because some orders were changed before the complaint date. For purposes of this analysis, we have included amounts paid to and ordered from CLB, but not cancelled before the date Noonan filed his complaint.

9. We note that in *Keeton*, the Supreme Court suggested that the distribution of 10–15,000 copies of a magazine in the forum state each month may not have been substantial enough to support

Having determined that sufficient minimum contacts to authorize general jurisdiction over CLB do not exist, we do not need to assess whether asserting jurisdiction would be reasonable under the gestalt factors. *See Donatelli,* 893 F.2d at 471.

#### (b) *RJR Tobacco*

■ Plaintiffs also argue that general jurisdiction over RJR Tobacco is proper under § 3(d) and Mass. Gen. Laws ch. 223, § 38. We will not, however, consider whether jurisdiction lies over RJR Tobacco because we do not agree with the premise that purportedly connects RJR Tobacco to this litigation. *Cf. Hachikian v. Federal Deposit Ins. Corp.,* 96 F.3d 502, 504 (1996) (concluding that we may affirm the entry of summary judgment on any alternate ground made manifest by the record).

While not disputing that it is the actions of RJR France, and not RJR Tobacco, that are put in issue by the allegations in their complaint, plaintiffs have nonetheless named RJR Tobacco as a defendant because (1) it, like RJR France, sells Winston cigarettes; and (2) it belongs to the same family of corporations as RJR Tobacco. These two assertions ignore the corporate form, and are patently insufficient to raise a claim involving an attribution of liability to RJR Tobacco under a veil-piercing theory in Massachusetts. *Cf. Birbara v. Locke,* 99 F.3d 1233 (1st Cir.1996) (discussing the stringent test for corporate veil-piercing in Massachusetts); *Omni–Wave Electronics Corp. v. Marshall Indus.,* 127 F.R.D. 644, 647 (D.Mass.1989) (stating that the mere assertion that defendants are alter egos or joint ventures is not sufficient to withstand a motion to dismiss); *American Home Assurance Co. v. Sport Maska, Inc.,* 808 F.Supp. 67, 73 (D.Mass. 1992) ("Piercing the corporate veil is permitted only where there is confused intermingling between corporate entities or where one corporation actively and directly participates in the activities of the second corporation, apparently exercising pervasive control.").

#### B. *Discovery Issues*

■ Plaintiffs contend that the district court abused its discretion in denying them permission to take jurisdictional discovery over defendants RJR Tobacco, R.J. Reynolds Tobacco International, Inc., R.J. Reynolds France, S.A., Lintas: Worldwide, Lintas:Paris, and Worldwide Brands, Inc. In addition, plaintiffs assert that the district court improperly limited discovery over CLB. We apply a deferential standard in reviewing the lower court's discovery rulings, reversing only if the orders were "plainly wrong and resulted in substantial prejudice to the aggrieved party." *Crocker v. The Hilton Int'l Barbados, Ltd.,* 976 F.2d 797, 801 (1st Cir. 1992) (citing *Santiago v. Fenton,* 891 F.2d 373, 379 (1st Cir.1989)).

#### (i) *The Advertising and Tobacco Defendants*

■ The denial of plaintiffs' request for jurisdictional discovery as to the tobacco and advertising defendants was not an abuse of discretion. Throughout this litigation, plaintiffs have argued that the denial of this request deprived them of the opportunity to ascertain the interrelationships among the defendants. Proving ties among the tobacco defendants or between Lintas:Paris and the tobacco defendants would not assist plaintiffs' cause absent a concomitant demonstration that Lintas:Paris availed itself of the Massachusetts forum. We have already ruled against plaintiffs on this point.

#### (ii) *Limitation of Discovery over CLB*

■ Plaintiffs contend that if the district court had allowed them leeway to discover all contacts between CLB and Massachusetts throughout the litigation period, they would have been able to establish general jurisdiction over CLB. In its decision to deny jurisdiction over CLB, the district court posed the question, "Is a foreign corporation's contact with the forum to be measured at the time of the alleged tort ..., at the time the Complaint is filed ..., or at any time ...?" *Noonan II,* 947 F.Supp. at 571. Judge

---

general jurisdiction. 465 U.S. at 779, 104 S.Ct. at 1480–81. CLB's efforts were not as regular as

those of Hustler Magazine's in New Hampshire, where Hustler had built up a subscription base.

Stearns applied the middle approach, and limited Noonan's discovery requests to contacts through the date the complaint was filed. We agree with this ruling insofar as it rejects as irrelevant post-complaint contacts. *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 569–70 (2d Cir.) ("In general jurisdiction cases, district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—up to and including the date the suit was filed—to assess whether they satisfy the 'continuous and systematic' standard."), *cert. denied,* —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996).

Plaintiffs dispute this approach on the grounds of law and policy. They first contend that a majority of courts routinely analyze contacts with the forum based on evidence from both before and after the date of the complaint. None of the cases they cite in support of this argument, however, directly speaks to the question posed here. *See Foster Wheeler Energy Corp. v. Metallgesellschaft AG*, No. 91–214–SLR, 1993 WL 669447, 1993 U.S. Dist. LEXIS 20450 (D.Del. Jan. 4, 1993); *American Home Assurance,* 808 F.Supp. 67; *Kolikof v. Samuelson,* 488 F.Supp. 881 (D.Mass.1980); *Mark v. Obear & Sons,* 313 F.Supp. at 375. Moreover, all of these cases, at best, involve a court's inclusion of fiscal-year sales or revenue figures (in each case, from a survey of data that spans several proceeding years) in its minimum-contacts analysis. Finally, the majority approach is not as plaintiffs suggest. *See Robertson–Ceco,* 84 F.3d at 569 (surveying cases from the Supreme Court and the Second, Fifth, and Ninth Circuits).

Plaintiffs also claim that limiting discovery to the complaint date is unfair. They maintain that, under such a rule, an entity which

causes an injury in Massachusetts from its non-forum based operations and thereafter chooses to enter the forum market could deny that jurisdiction over it existed even though it enjoys the benefits of the forum and was, prior to market entry, on notice of the litigation. They also warn that undesirable exploitation of statute of limitations periods will result from limiting the contact analysis to the period before the complaint date. Savvy plaintiffs who wait until the end of the limitations period to maximize the chance of asserting jurisdiction will be rewarded for their dilatory tactics.

Whatever merit such policy arguments might have, the central fact remains that the time the complaint is filed is the time at which the plaintiff urges the court to assert its authority over the defendant. It would be conceptually incoherent to permit the court to look to post-complaint contacts in proving that it had authority at a previous time.[10] Therefore, while Noonan may have discovered additional contacts between CLB and Massachusetts had he been permitted to continue discovery throughout the litigation, such contacts have no bearing on the jurisdictional analysis. Accordingly, the district court did not abuse its discretion in ruling as it did.

For the reasons stated above, the judgment of the district court is ***affirmed.*** Costs to appellees.

---

**10.** Given our basis for rejecting plaintiffs' claims, we have considerable doubt about CLB's argument that the sufficiency of contacts for general jurisdiction should be assessed at the time of the alleged tort. Although Judge Stearns used the complaint date to bound the minimum contacts analysis, he appears to have agreed with CLB, positing that, "to the extent that foreseeability is a touchstone of due process[,] logic would measure general jurisdiction as of the date the tortious act is committed." *Noonan II,* 947 F.Supp. at 571. CLB argues the choice to forbear from the conduct that might cause the injury inspiring

the suit can be made only at the time the tort is about to be committed. We note the foreseeability question is not whether the defendant should reasonably expect to be called into court but whether, given that the defendant has been called to court, the defendant would be surprised to find a *particular* court has called him. Asking this question from the perspective of the defendant at the time he allegedly committed the tort is likely premature because not until the complaint is filed is the court asked to exercise its sovereignty.